UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| STEVE WATSON, RODERICK GIVAN, and DAVID LOVE, <br><br> Plaintiffs, <br><br> v. <br><br> NORTH TEXAS MUNICIPAL WATER DISTRICT, <br><br> Defendant. | CIVIL ACTION NO. <br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Steve Watson, Roderick Givan, and David Love ("Plaintiffs"), by and through their attorneys, Ellwanger Henderson LLLP, bring this action for damages and other legal and equitable relief from Defendant, North Texas Municipal Water District ("Defendant" or "NTMWD"), for violations of 42 U.S.C. section 1981, and any other causes of action that can be inferred from the facts set forth herein.

## INTRODUCTION

This is an action brought by Plaintiffs seeking damages from Defendant for acts of intentional discrimination based on race. Plaintiffs Watson, Givan, and Love, Black men who were employed as transport drivers for NTMWD, were forced to endure a racially hostile work environment and were retaliated against when they reported their mistreatment. Plaintiffs seek relief under 42 U.S.C. § 1981, *et seq*. ("Section 1981").

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) 42 U.S.C. § 1981, *et seq.*, as amended.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper in that the acts complained of herein, including unlawful employment practices, occurred within the federal District over which this Court has jurisdiction.

## PARTIES

3. Mr. Watson, Mr. Givan, and Mr. Love are persons who have been aggrieved by Defendant's actions. Their race is African-American.

4. At all relevant times, Plaintiffs were Defendant's employees and therefore covered by Section 1981.

5. The acts of discrimination occurred in and around Richardson, Plano, and Melissa, Texas.

6. During all relevant times, Defendant has been an employer covered by Section 1981.

7. Defendant's principal administrative building is located at 501 E. Brown Street, Wylie, Texas 75098.

## STATEMENT OF FACTS

8. Plaintiff Watson was hired by Defendant in 2018 to work as a transfer driver.

9. Plaintiff Givan was hired by Defendant in June 2020 to work as a transfer driver.

10. Plaintiff Love was hired by Defendant in or around 2010 to work as a sludge driver. After a brief job change, Love was re-hired in or around 2015 to work as a transfer driver.

11. NTMWD manages and operates three solid waste transfer stations and one landfill. Two transfer stations are located in Plano, Texas, and one is in Richardson, Texas. As transfer drivers, Plaintiffs' job involved driving 18-wheeler trash trucks to transport city trash from the transfer stations to the landfill in Melissa, Texas.

### FACTS REGARDING THE RACIALLY HOSTILE WORK ENVIRONMENT

12. Throughout Plaintiffs' employment with NTMWD, they were subjected to an environment of pervasive racial discrimination. The overwhelming majority of transport drivers were white.

13. Plaintiffs and the other transport drivers for NTMWD used CB radios to communicate. NTMWD required Plaintiffs to have their CB radios on at all times.

14. The CB radio "chatter" from the other transport drivers was constantly filled with hostile race-based language.

15. Watson and Love were two of the first Black transport drivers hired by NTMWD. Shortly after his hiring, Watson was told by a white driver that NTMWD used to have KKK meetings in its parking lot "back before they started hiring Blacks." Drivers also warned Watson that it was not safe for him to be out in Melissa, Texas after dark, saying "no niggers after dark."

16. Around this same time, Watson and Love heard other drivers refer to Cowboys quarterback Dak Prescott, who is Black, as a "monkey," with one saying that he refused to "watch

that monkey play ball."

17. Watson also heard another NTMWD employee say over the CB radio that his grandfather "would roll over in his grave if he knew there had been that Muslim monkey boy in office," in reference to former President Obama. After President Trump was elected, a white driver told Love that "the niggers lost."

18. Sometimes when their CB radios got within range of white drivers, Watson and Love would hear the drivers whistle. Love was told that the white drivers whistled to let each other know that a Black driver was listening.

19. When Plaintiff Givan started work in 2020, he was one of a small handful of Black drivers. Givan was told by Landfill Manager Jerry Zumwalt that he was hired because Zumwalt felt like he had to hire a Black driver.

20. A few days after he started working for NTMWD, Givan witnessed a white driver nicknamed "Cowboy" berate an elderly Black temporary worker who was picking up trash. Cowboy started yelling at the man to "move out of my way, nigger monkey!"

21. Givan was shocked by the incident and told Watson about it, asking Watson "is this really what it's like here?" Watson reported the incident to a manager at the Parkway Transfer Station, who asked the white driver to apologize. Nothing else was done.

22. Shortly thereafter, Givan heard a white driver on the CB radio say "I don't know how all these monkeys keep getting jobs here, it was bad enough when we had one monkey but now we have three" (in reference to Givan, Love, and Watson). Another driver responded in agreement, calling the Plaintiffs "the three little niggers."

23. Love was referred to as a "nigger" at the landfill on a near daily basis. For example, Love was once backing his truck into the landfill and a white employee said over the

radio "this dumbass nigger." When Love would ask if they were ready for him to dump his load at the landfill, white employees would respond "nigger, no." These comments were constant.

24. Watson and Givan also heard white drivers frequently complain about Black Lives Matter, making comments like "I wish those BLM guys would come here, we'd shoot them all in the back."

25. A white driver who was friendly with Watson and Givan told Watson that he was being "shunned" by the other white drivers for being nice to Black drivers. He told Watson that the other white drivers would not talk to him in the break room.

26. While Plaintiffs were employed, NTMWD hired contractors who prominently displayed confederate flags on their trucks. This felt like a slap in the face to Plaintiffs.

27. Landfill Manager Jerry Zumwalt had a CB radio and could hear the race-based comments being made over the radio.

28. In one incident, all three Plaintiffs were briefly talking to one another at the landfill. A white driver said, "hey look, a meeting of the monkeys."

29. Plaintiffs frequently reported the discrimination and hostile work environment to their Foreman, Gerald Jones, who was also a Black man. Jones himself was frequently subjected to racial invective.

30. Shortly after Jones was first made a manager, he and Love were walking together on-site and a white employee looked at them and said "these niggers are taking over."

31. Jones complained about the racially hostile environment at NTMWD at a meeting of all the NTMWD supervisors. Shortly thereafter, Jones was fired. Jones was allegedly fired because he let workers leave early without authorization. However, Watson was told by white employees that the situation with Jones was a "set up" to get rid of a Black supervisor.

32.    After Jones was fired, Plaintiffs all began reporting directly to Zumwalt.

## FACTS SPECIFIC TO PLAINTIFF WATSON

33.    Despite the hostile work environment he was forced to endure, Watson felt that having a Black foreman provided a small level of protection. However, once Jones was fired, it appeared a concerted effort was made to force Black employees out of NTMWD.

34.    Shortly after Jones was fired, Watson was on the job at the transfer station. He was standing next to his truck as it was being loaded. Before the tarp covering his truck was fully withdrawn, the Lead Equipment Operator, white, began aggressively tamping down the load in Watson's truck with a front loader. He shook Watson's trailer so violently that it fell over onto Watson's leg, resulting in Watson's leg being hyperextended. Watson was forced to take extended medical leave as a result of this injury.

35.    Watson's work environment was so toxic that he sought a transfer to a job as a Construction Inspector with NTMWD. This position would have allowed him to have new managers and coworkers. Watson was experienced for the position because he had worked as an inspector in another state. However, Watson's application had to "cleared" by his current management before he was authorized to apply for the transfer. Watson repeatedly asked Jerry Zumwalt if his application had been approved, but Zumwalt always replied that the application never came through. Watson alleges that Zumwalt was thwarting his ability to transfer because of his race and because he was being punished for reporting race discrimination.

36.    As a direct result of the racially hostile work environment, and discriminatory terms and conditions of employment, Watson was constructively discharged in February of 2022

## FACTS SPECIFIC TO PLAINTIFF GIVAN

37.    Givan was horrified by the racially charged work environment at NTMWD and

by the firing of Jones. Like Watson, Givan alleges that the firing of Jones evidenced an intention on the part of NTMWD to force out Black employees.

38. In addition to enduring a constant barrage of racially hostile comments, Givan was also subjected to harsher working conditions than his white colleagues. For example, Saturdays were always a slow day on the job. The white drivers would often be told they could go home early, but Zumwalt never allowed Givan to leave early. Instead, he would have to finish the workday alone.

39. Furthermore, Givan was singled out because he had previously made good money in the oil field and drove a nice truck. White drivers would call Givan a "spoiled boy" and a "wannabe thug."

40. Givan grew so disgusted with the constant discriminatory comments from other drivers that he turned off his CB radio. Landfill Manager Jerry Zumwalt admonished Givan for turning off his radio, saying it was against policy. Givan explained that he turned it off because of the constant racially hostile invective he was forced to endure. However, Zumwalt still gave Givan a write-up and did nothing to address the racial harassment.

41. Shortly thereafter, Givan was driving with his CB radio on (as mandated by Zumwalt) and a white co-worker began discussing Givan's wife, who is white. The co-worker asked "how did a monkey like that get a beautiful woman like her?" Another co-worker responded, "well that is one piece of white trash I won't ever touch." Givan, understandably angry, told the drivers that if they are so bold, they should get out of their trucks and say it to his face.

42. One of the drivers involved reported the incident to Zumwalt, who declined to punish the white drivers but instead gave Givan another write-up, this time saying that he was creating a bad work environment. Givan refused to sign the write-up.

43. Not long after, Givan was eating lunch in the employee break room. Zumwalt walked in, went over to Givan's table, and stuck his hand in Givan's food. Zumwalt then looked Givan in the eye and said, "if you want to work here, then there's nothing you can do about it." This was the last straw for Givan, who was constructively discharged in November 2020.

### FACTS SPECIFIC TO PLAINTIFF LOVE

44. In or around 2019, Love was exiting the landfill at the same time a white driver was driving in. The white driver got angry at Love and began yelling at him and calling him a "nigger." Love was upset and reported the incident verbally in-person to the manager of Human Resources. Nothing was done. After that incident, Love felt that reporting the racially abusive environment was pointless.

45. Around this same time, Love attended an on-site retirement party for an outgoing manager. At the party, Love spoke with Zumwalt's wife. Love thought they were having a pleasant conversation and he made a comment to the effect of "I will have to come out to y'all's house sometime!" Zumwalt's wife responded, "no, Zum doesn't like niggers."

46. After Jones was fired and Zumwalt became Landfill Manager, Love experienced increased racial-hostility and punitive treatment. Zumwalt began looking for any reason to discipline Black drivers. Love was constantly nit-picked over paperwork and other minor details in a way that white drivers were not.

47. Love was always being given hand-me-down equipment while white drivers would get new trucks. When Love's truck would break down, he would have to drive other people's trucks. White drivers would leave bottles full of their spit in the trucks, knowing that Love would have to clean them out before driving.

48. One day Love walked into the office and two white managers and some other

white employees were telling jokes such as "how many Black guys does it take to screw in a lightbulb?" They saw Love but continued to tell the derogatory jokes in his presence, knowing that there was nothing he could do about it.

49. Love grew increasingly upset about the racially hostile work environment he was forced to endure. He was constructively discharged in 2020.

## CAUSES OF ACTION
### Count I
### EMPLOYMENT DISCRIMINATION – HOSTILE WORK ENVIRONMENT
*42 U.S.C. § 1981, et seq.*

50. Plaintiffs are members of a protected class and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

51. The conduct alleged herein violates 42 U.S.C. § 1981, *et seq.*, as Plaintiffs were subjected to unwelcome harassment on the basis of their race, Black.

52. The harassment was severe and/or pervasive and affected the terms, conditions, or privileges of Plaintiffs' employment with Defendant.

53. Defendant knew or should have known of the harassment and failed to take prompt remedial action.

54. Plaintiffs' requests for relief are set forth below.

### Count II
### EMPLOYMENT DISCRIMINATION - RETALIATION
*42 U.S.C. § 1981, et seq.*

55. Plaintiffs are members of a protected class and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

56. Plaintiffs lodged complaints with Defendant regarding the discrimination and hostile work environment based on race to which they were subjected, and as such, engaged in protected activity under § 1981.

57. Defendant retaliated against Plaintiffs by subjecting Plaintiffs to harassment, unfavorable terms of employment, dangerous working conditions, denied transfers, and other behavior that would deter a reasonable person from engaging in protected activity.

58. But for Plaintiffs' complaints to Defendant, Plaintiffs would not have suffered retaliation and the denial of the terms, conditions, and benefits of their employment with Defendants, leading to their constructive discharge.

59. The conduct alleged herein violates Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 *et seq.*

## Count III
### EMPLOYMENT DISCRIMINATION – CONSTRUCTIVE DISCHARGE
*42 U.S.C. § 1981, et seq.*

60. Plaintiffs are members of a protected class and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

61. The conduct alleged herein violates 42 U.S.C. § 1981, *et seq.*, as Plaintiffs were subjected to a hostile work environment on the basis of their race, Black.

62. The harassment by Defendant altered Plaintiffs' work conditions and made them so intolerable that they were compelled to resign.

63. But-for Defendant's continuous, severe, and pervasive discriminatory conduct based on race, Plaintiffs would not have resigned.

64. Defendant knew or should have known of the harassment and failed to take prompt remedial action.

65. Plaintiffs' requests for relief are set forth below.

## DEMAND FOR JURY TRIAL

66. Plaintiffs demand a jury trial on all matters raised in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for the following relief:

67. That the practices of the Defendant complained of herein be determined and adjudged to be in violation of the rights of Plaintiffs under the federal law identified above prohibiting discrimination and retaliation in employment;

68. That judgment be entered in favor of Plaintiffs as set forth herein, and against Defendant, for back pay (including interest or an appropriate inflation factor), front pay, benefits and all other amounts owed to Plaintiffs;

69. That Plaintiffs be awarded compensatory damages for their employment discrimination claims including future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses;

70. That Plaintiffs be awarded pre-and post-judgment interest;

71. That the Court award Plaintiffs reasonable attorneys' fees and costs associated with this matter, including but not limited to expert fees and costs;

72. That the Defendant be ordered to require training regarding discrimination based upon race and discrimination based on retaliation.

73. That the Court retain jurisdiction over Defendant until such time as it is satisfied that it has remedied the practices complained of and is determined to be in full compliance with the law; and

74. That the Plaintiffs be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: April 11, 2023

Respectfully submitted,

*/s/ Jay D. Ellwanger*
Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@equalrights.law
Melissa R. Holman
Texas State Bar No. 24064501
mholman@equalrights.law
8310-1 N. Capital of Texas Hwy, Suite 190
Austin, TX 78731
Telephone: (737) 808-2262
Facsimile: (737) 808-2238

***COUNSEL FOR PLAINTIFFS***